# FEBRUARY, 1925.

### L. G. HANKS v. THE STATE.

#### No. 8988.   Delivered February 11, 1925.

1.—Murder—Evidence—Arms and Whisky—in Appellant's Possession—Admissible.

Where on a trial for murder, the state was permitted to prove that the automobile in which appellant was riding, when the shooting occurred, contained jugs, bottles of whisky, empty cartridges and pistols, no error is shown, nor was a search warrant necessary to authorize the discovery of these articles. This testimony was admissible as being a part of the transaction, and as showing that appellant was guilty of a felony, that is, the transportation of intoxicating liquor, and was prepared to resist arrest by force, if necessary, when halted by the officers, immediately preceding the shooting. See Wharton on Homicide, p. 943, and other authorities cited.

2.—Same—Authority to Arrest—Warrant Unnecessary.

The authority of the officers to arrest the appellant and his companions, if they were committing a fe'ony in their presence, is statutory. Art. 259, C. C. P., also to possess themselves of the evidence of the crime upon the arrest of the accused. See Jones v. State, 85 Tex. Crim. Rep. 538.

3.—Same—Conspiracy—Acts and Declarations of Co-conspirators.

On the issue of conspiracy, it was competent to prove the relation of appellant, with his companions in the car, including the journey, which at the time of the tragedy v as incomplete, and which began at the home of appellant, and that he and the negroes who were in the car with him were drinking whisky together, their acts and conversations antecedent to the homicide and bearing upon the offense of transporting the liquor.

4.—Same—Evidence—Opinion—Not Admissible.

The testimony of Vaught in rebuttal that appellant shot Martin, was apparently an opinion deduced from circumstances, and should have been excluded.

5.—Same—Charge of Court—Limiting Effect of Evidence—Properly Refused.

Where certain objects and surroundings of the transaction are introduced in evidence, which are relevant to the case in chief, the effect of such evidence should not be limited by the charge of the court, and there was no error in the refusal of the court to so limit it.

6.—Same—Charge of Court—On Limiting Effect of Evidence.

It being in evidence that appellant at the time of the beginning of the difficulty was engaged in the commission of another offense that was a part of the transaction, no limiting charge was required with reference to such evidence. Branch's Ann. P. C., sec. 189.

7.—Same—Conspiracy—Issue of—Properly Submitted.

The court properly submitted the issue of conspiracy. From the State's standpoint appellant and others entered into a conspiracy to commit a felony, and armed themselves, in order to resist those who might interfere with them, and at the time of the homicide he was acting with his co-conspirators in committing the felony of transporting liquors, and killed the deceased, with the firearms used in resisting their arrest. See Cox v. State, 8 Tex. Crim. App. 254 and other cases cited in opinion.

8.—Same—Charge of Court—Self Defense—Improper Limitation of.

The charge of the court on self defense is an improper limitation of appellant's rights. The purpose and intent of Martin and Vaught, to kill the defendant or inflict upon him some serious bodily injury, was not the proper predicate of his right of self defense. It was not the intent of his assailants by which his right to protect his person was to be tested, but by their words, and acts as they appeared to him, viewed from his standpoint at the time. He was entitled to act on appearances, and his right of self defense, might be perfect, though in fact he was in no actual danger.

9.—Same—Misconduct of Jury—Discussing other Conviction—Jury Must be Fair.

Appellant's contention that there was such misconduct of the jury, and that a prejudiced juror was among those who tried the case should have been sustained. It is clearly shown that the jury discussed a former conviction of appellant for a homicide, and it was also established that one of the jurors, Mosby, sat on the jury that had before tried, and convicted appellant of a homicide, and that he failed to divulge this fact on his voir dire examination. It was also disclosed that this juror had expressed his animus toward appellant before the trial. A new trial should have been granted.

10.—Same—Amended Motion for New Trial—Improperly Rejected.

Appellant's motion for a new trial was not properly verified. When his attention was called to the fact appellant filed a verified statement to the effect that the verification of the motion was an oversight, and asked that he be permitted to amend it. He also presented an amended motion, which was in the identical language as the original, and was verified. This the court refused to permit on the ground that he was without jurisdiction. The court was in error in this proceeding, as it was shown that it was at the same term of the court, during which the judgments were under the control of the court. The same question was decided by this court in Bundick's case, 59 Tex. Crim. Rep. 9. In our opinion the amended motion should have been considered.

Appeal from the District Court of Nacogdoches County. Tried below before the Hon. L. D. Guinn, Judge.

Appeal from a conviction of murder; penalty, fifty years in the penitentiary.

The opinion states the case.

*V. E. Middlebrook*, of Nacogdoches, for appellant.

*Tom Garrard*, State's Attorney, and *Grover C. Morris*, Assistant State's Attorney, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder; punishment fixed at confinement in the penitentiary for a period of fifty years.

On the night of March 25, 1924, the deceased, John W. Martin, was killed. In the same encounter Bud Dixon was also killed. I. V. Nobles was wounded by blows over the head, and T. G. Vaught received two gunshot wounds in one of his legs. Appellant received gunshot wounds in both of his legs and a slight wound in his arm. The tragedy took place on a bridge. An automobile driven by Bud Dixon in which I. V. Nobles and the appellant were also traveling was stopped at the instance of Vaught and Martin. Dixon and Nobles were negroes. They were in the front seat of the car while the appellant, a white man, rode in the rear seat. Vaught was the sheriff of Nacogdoches County and Martin was his deputy.

Vaught and Martin, having in mind the interception of an automobile, in which whiskey was unlawfully transported, drove their car to a bridge and stationed it in a position so as to prevent passage. Upon the arrival of Dixon's car, it was stopped and the sheriff said:

"I am the sheriff and you are the fellows I am looking for; throw up your hands. I want that whiskey."

Dixon and Nobles threw up their hands. The sheriff approached the car, threw his light on the back seat, and upon observing a man there, also a jug, said to Martin:

"Here is a white man in this car with these negroes. We will have to take the whiskey out."

The sheriff had his pistol in one hand and a flash-light in the other. As Martin was about to open the curtain of the car the firing began. Three shots were first fired, which, according to the flash fairly indicated that they came from the back of the car. As the shooting began, Martin stepped two feet away from the car and began firing. When the firing ceased, the sheriff heard someone leaving the car and in going around it, he apprehended Nobles, struck him on the head with his pistol, and said to Martin to stop the man who was going away. He saw Martin about that time trying to walk but he gave down to his knees and said: "I am shot through and through; I am killed."

· A five-gallon jug of whiskey was taken out of the car and was exhibited to the jury at the time of the trial. The pistol which was in the death grip of Bud Dixon was also removed and exhibited.

The appellant escaped, but was shortly apprehended.

There was evidence coming from the witness Thames to the effect that on the morning of the day of the homicide, appellant met two negroes at a point some fifty miles from the scene of the homicide; that they went together in an automobile to the home of the appellant; that at the appellant's house a five-gallon jug was transferred from the wagon to the automobile.

Nobles testified that he and Dixon, riding in Dixon's car, met the appellant, who was riding with a man in a buggy; that they all went to the home of the appellant except the man who owned the buggy; that he saw a bottle setting on a table in the appellant's house, and also saw appellant take a jug out of a wagon close to the house and put it in Dixon's car. After drinking some whiskey, they got in the car and came to the point where the tragedy occurred. When they reached the bridge, Dixon said: "There is Mr. Vaught now." He and Dixon put up their hands upon the order of the sheriff. Soon after the witness heard a shot and then another, and fell down on the floor in front of the seat where he remained until the shooting ceased, when Vaught said to Martin:

"Where did the fellow go? Why didn't you stop him?"

Martin replied:

"I couldn't stop him. I am shot through and through, and I am going to die."

He afterwards fell to his knees in front of the car.

The appellant's theory as developed from his testimony, is this: He was a married man, twenty-four years of age, and resided in Houston County about fifty miles from Nacogdoches. Prior to the homicide he had not known Martin and had no ill-feeling towards Vaught. He had known him, however, for some two years. He was a passenger in Dixon's car without knowledge that the car contained whiskey.

It was raining slightly on the night of the tragedy. On coming to the bridge, they observed a car angling across the road with the lights on. Dixon said: "There is Mr. Vaught now." He came up in front of the car and demanded that they halt. Dixon stopped the car but did not kill the motor. Vaught had a gun in one hand and a flash-light in the other. He threw the light on the parties in the front seat and told them to throw up their hands. One of the negroes put his hands up higher than the other. Vaught had his gun cocked and told them to throw up their hands or he would blow their brains out. Martin was told to go around and see what was in the car, and he came up to the side of the car. Vaught was on the other

side of the car near the front. Appellant had put up his hands at the command of Vaught. Martin gave the curtain a jerk but it did not come loose. Appellant had his hands up at the time and was sitting angling with his foot against the door. His foot slipped and Martin fired. Appellant took it to be Martin who did the shooting. No previous shots had been discharged. The first shot made a wound in one of his legs. Another shot wounded the other leg, and he also had a slight wound on the arm. When the first shot was fired, Vaught was somewhere near the front of the car. Appellant did not see Martin from the time the first shot was fired up until the shooting was over. When he next saw him, he looked back and heard Vaught say: "Stop that man, shoot him, stop him." Martin replied that he could not do so because he was shot. Up to that time appellant was not aware that any one except himself had been shot. Just before Martin fired the first shot, he stepped back, Appellant never saw him any more until after the shooting. He said he did not shoot at Martin. Appellant said that at the time of the shooting he was shooting straight ahead; that the others were shooting into the car and did so before he shot at all. Quoting him, he said:

"My pistol was behind me on the seat when the shooting began. Three shots were fired before I shot, two coming from the side of the car and one from the front."

The position taken by the appellant as revealed by several of the bills that the articles found in the automobile, including the jugs, bottles of whiskey, certain empty cartridges and pistols, were not usable in evidence against him for want of a search-warrant in possession of the officers is not tenable. The view is in conflict with the decision of this court in Welchek v. State, 93 Texas Crim. Rep., 271. We think the position is also untenable for the additional reason that these articles were admissible as a part of the transaction. They were relevant also as circumstances supporting the State's theory that the appellant and his companions were engaged in the commission of a felony at the time of their attempted arrest and that they were acting together as co-conspirators in committing a felony and to resist arrest by force if necessary. See Wharton on Homicide, p. 943; Michie on Homicide, Vol. I, p. 821, Section 170, also p. 829; Heley v. State, 84 Texas Crim. Rep., 631, and cases cited.

The authority of the officers to arrest the appellant an his companions if they were committing a felony in their presence is statutory. Art. 259, C. C. P.

The right of the officers to possess themselves of the evidence of the crime upon the arrest of the accused is fundamental. See Jones v. State, 85 Texas Crim. Rep., 538.

On the issue of conspiracy, it was competent to prove the relations of the appellant with his companions in the car including the journey, which at the time of the tragedy was incomplete, and which began at the home of the appellant, at which place he and the negroes who were in the car with him were drinking whiskey together. There is much said in the record about the introduction of evidence about the empty five-gallon jug which seems to have been gotten from the barn upon the premises occupied by the appellant. We have been unable to perceive the relevancy of this item of evidence. Nor does its importance impress us. However, upon another trial, unless its relevancy is disclosed, it should be excluded upon objection.

The testimony of Vaught in rebuttal that appellant shot Martin was apparently an opinion deduced from circumstances, and should not have been received.

There was no error in refusing to give a charge limiting the effect of the various objects which were introduced in evidence. They were all relevant upon the issue of guilt or innocence.

The evidence going to show that the appellant at the time of the beginning of the difficulty was engaged in the commission of another offense was a part of the transaction. No limiting charge was required with reference to such evidence. Branch's Ann. Texas P. C., Sec. 189.

The acts and conversations of Bud Dixon antecedent to the homicide and bearing upon the commission of the offense of transporting intoxicating liquor, we think, were not improperly received. See Cox v. State, 8 Texas Crim. App., 254; Smith v. State, 28 Texas Crim. Rep., 233; Wharton's Crim. Ev., Vol. 2, Sec. 919.

The declaration of the deceased that he "had been shot through and through" was a part of the *res gestae.*

The exclusion of the testimony touching the excitable nature of the sheriff and his use of narcotics was proper.

The facts in evidence justified the court in submitting the issue of conspiracy. From the State's standpoint, appellant and others entered into a conspiracy to commit a felony and armed themselves in order to resist those who might interfere with them, and at the time of the homicide, he was acting with his alleged co-conspirators in committing the felony of transporting intoxicating liquors, and killed the deceased with the firearm used in resisting their arrest. See Cox v. State, 8 Texas Crim. App., 254; Hays v. State, 90 Texas Crim. Rep., 12; Coomer v. State, 97 Texas Crim. Rep., 591; Vernon's Texas Crim. Stat., Vol. 2, p. 37; Cyc. of Law & Proc., Vol. 21, p. 679, subdivision 2.

In the charge on self-defense, the following is found:

"* * * If you believe that the defendant killed the deceased about the time charged in the indictment, and by the means charged

in the indictment, he would be justifiable if he did so to prevent John W. Martin from killing him, or inflicting serious bodily injury upon him if it reasonably appeared to the defendant by the acts of said Martin or by the words of said Martin, coupled with his acts at the time of such killing, if any, or by the acts of T. G. Vaught, or by the words of said T. G. Vaught coupled with his acts, *provided you believe that Martin and Vaught were acting together,* or if it appeared to the defendant that they were acting together, *and you believe that it was the purpose and intent of said Martin and Vaught, or either of them, to kill the defendant, or inflict on him some serious bodily injury,* and you believe the defendant killed the deceased Martin under such circumstances, you will acquit him on the ground of self-defense.''

According to the appellant's testimony, Martin fired the first shot and at that time the appellant was committing no offense, but was sitting on the rear seat of the car holding his hands aloft in obedience to the command of the sheriff who had a drawn pistol in his hand. It is the State's theory that when Martin attempted to remove the curtain from the car in order to take the jug of whiskey out of it, the first shot was fired by the appellant. It was the theory of the State as developed from eye witnesses, that the intent of Martin and Vaught was to apprehend the appellant and those who were with him because they were engaged in committing the felony of unlawfully transporting whiskey. It appears that after the firing of the first shot a number of shots were fired, some by Martin, some by Vaught, and some by the appellant. Based upon the condition of the automobile and the testimony going to show that Vaught fired several times, the theory is advanced by the appellant that Martin was shot by Vaught and not by the appellant. In submitting the issue of self-defense, the court should have refrained from so framing his charge as to condition the appellant's right to defend his life upon the belief by the jury that it was the purpose and intent of Martin and Vaught, or either of them, to kill the appellant or inflict upon him serious bodily injury. It was not the intent of his assailants by which his right to protect his person was to be tested but by their words and acts as they appeared to him, viewed from his standpoint at the time. Under the charge the jury was not given to understand that appellant might act upon appearances and that his self-defense might be perfect though in fact he was in no actual danger, but the language mentioned could have no other meaning than that if it was not the intent of Martin and Vaught, or one of them, to kill the appellant or inflict upon him serious bodily injury, appellant would be guilty without reference to any well-founded belief he may have had, based upon the words and acts of the deceased and his companion.

Appellant endeavored to remedy the fault in the charge both by exception and by a special charge. In failing to amend the charge, we are of the opinion that the learned trial judge fell into error. "Whether the danger is real or apparent is to be determined from the defendant's standpoint." A charge which requires the jury to find that the danger in fact existed is erroneous. "It is the belief of defendant as to the existence of facts, and not the truth of the facts, that should be submitted to the jury." Branch's Ann. Texas P. C., Sec. 1928; Arthur v. State, 46 Texas Crim. Rep., 479; and numerous other cases collated by Mr. Branch in his Ann. Texas P. C, p. 1079. The statute declares that the purpose and intent of the deceased must reasonably appear from his acts or his words coupled with his acts. Art. 1105, P. C.; Dugan v. State, 86 Texas Crim. Rep., 130; Petty v. State, 86 Texas Crim. Rep., 324; Williams v. State, 87 Texas Crim. Rep., 280. It is a reasonable apprehension or fear of death or serious bodily harm that justifies homicide. Art. 109, P. C.; Vernon's Texas Crim. Stat., Vol. I, p. 663; 1922 Supplement, p. 2302; Singleton v. State, 86 Texas Crim. Rep., 401.

In his motion for new trial appellant embraces two paragraphs setting up alleged facts upon which he based the contention that the jury was guilty of misconduct in that one of the jurors, having sat upon the jury which had previously rendered a verdict against the appellant for homicide refrained from revealing that fact upon his *voir dire,* but conveyed the information to his fellows, and that his report of it to them was not accurate in that he stated that the penalty was fixed at confinement in the penitentiary for five years, when, in fact, it was only two years. Attached to the motion for new trial was the affidavit of one of the jurors supporting these averments. Upon hearing the motion, all of the men who sat upon the jury in the appellant's trial were called and interrogated.

Buckner testified on the hearing that he was foreman of the jury. From his testimony we quote:

"My recollection is that after we retired to consider our verdict one of the jurors said something about Mr. Hanks having been convicted for a killing where he killed a negro woman once before and was given a five years' suspended sentence. I can't recall who it was that made that statement. I thought I knew but he says he didn't say it. * * * That statement was made by whoever it was that made it, after we had taken three votes.

"We took three votes and some of the jurors didn't vote and we were talking about it. * * * I will tell the court I am sure some one mentioned it while we were deliberating on our verdict. I know that to be so. That conversation was not in the presence of the whole jury; just me and him were talking and I can't remember

99 Tex. Crim.—15.

who he was. \* \* \* The party I was talking to had not voted
and I asked him how he stood and he told me that so many years,
with the five-year suspended sentence added to it would make so
many years. He thought the five-year suspended sentence was still
hanging over him, but I didn't know anything about it. That gen-
tleman did not claim to be a member of the jury that had given him
the five-year suspended sentence because that man had already voted.
I am positive he spoke of the number of years he wanted to give in
this case, and then so many years, five years added to it, would make
so many years, and he would be willing to give him the number of
years he had in his mind, with the five years added to it.

"Mr. Mosby first mentioned it when he came into the jury room
on the lower floor while the jury was being chosen and then again
down three or four or five days later it was mentioned again after
the charge was delivered to us just as I have stated. We took four
ballots altogether and I know when it was mentioned in the jury
to me it was before the final ballot was taken and after the first
three ballots had been taken. I stood for a penalty of ninety-nine
years on the original ballot. One of the two men I talked to stood
for fifteen years and the other stood for twenty, but I can't remember
who the second party was I talked to, but the first man I talked
to was Mr. Tucker, and the first man I talked to was for fifteen
years. \* \* \*

"The first time I heard it was when Mr. Mosby came into the
jury room and said he was surprised at being taken on this jury
because he was on the other jury. That was the day Mr. Mosby
was selected as a juror. The first ballot we took was to determine
whether he was guilty or not guilty. \* \* \* I was not mention-
ed from the time Mr. Mosby said that until we went to vote the
first time and found him guilty. The first ballot was guilty, but
we varied as the the number of years. The man who mentioned
the suspended sentence was one of the low men and was for either
fifteen or twenty years and he stated that the five years added to
what he thought he ought to have would not make at least over
twenty-five years and that is all that was said about it, and the
man who mentioned that was for not over twenty-five years."

Each of the jurors remembered that the information mention-
ed had been conveyed to the jury. Some of them were uncertain
as to who first mentioned it, but most of them were of the opinion
that after the information was first conveyed, there was no further
discussion. One or two of the jurors knew of the previous con-
viction, but were not aware of the penalty assessed. Several of
them gave testimony that Mosby mentioned it and stated that the
penalty in the former case was a suspended sentence of five years.
Most of the members of the jury were ignorant of the former con-

viction until the information was given by one of their number after they were selected upon the jury.

Juror Mosby was introduced by the State and testified that at the time of his *voir dire* he thought of the fact that he had been on the jury which had tried the appellant on the former occasion and expected that some one would ask him about it at that time; that no specific inquiry upon the subject was made, but he was asked if he knew of any reason which would prevent him from being absolutely fair and impartial. He was also asked whether there was anything in his mind which he had not disclosed or which might make him unacceptable to the attorneys for the appellant. To each of these questions he gave a negative answer. He was the eleventh juror selected. After being impaneled, he joined the other ten jurors and told them that he was surprised at being accepted upon the jury as he had been upon the jury in the trial of another case against the appellant. In talking to the jurors he told them that he did not recognize the appellant and that he would venture to say that the appellant did not recognize him.

It was shown that on the former occasion the appellant had been charged with homicide and had entered a plea of guilty; that by agreement the district attorney had recommended the lowest penalty and a suspended sentence; that the verdict was rendered in accord with this suggestion.

Attached to the motion was the affidavit of Roy Campbell in which he stated that he had had a conversation with juror Mosby before he was taken on the jury in which Mosby said that he believed that the State's counsel would take him but did not believe that the defendant would accept him because he had sat upon the jury against the defendant when he was charged with killing a negro woman and given a five-year suspended sentence. He said that he believed he would qualify as a juror. He said that he had tried "Old Hanks" and said that he was a brother of Old Lynn Hanks and that there was nothing good about either of them; that he believed that Hanks was the one who shot Martin. This conversation was denied by Mosby. Campbell also testified on the hearing to substantially the same matters.

Both the appellant and his attorney testified that they had no knowledge of Mosby's conduct and that he was not recognized as one of the jurors in the former case, and that they had no knowledge that he was one of them. Mosby denied the truth of Campbell's testimony. State's counsel was aware of the fact that Mosby had been on the jury in the former case.

The court made the following notation on the bill:

"The above examined and approved with qualification that motion for new trial was not verified, and ordered filed as the statement of facts in this cause this the 27th day of June, A. D., 1924."

Appellant, when the motion was made, filed a verified statement to the effect that the verification of the motion was an oversight and asked that he be permitted to amend it. He also presented an amended motion which was in the identical language as the original, which amended motion was duly verified. To this a demurrer was addressed by State's counsel, and the court made this indorsement:

"And the court after hearing and considering the defendant's Second Amended Original Motion for a New Trial, and the State's Demurrer thereto, in all things sustained the demurrer and overruled said Second Amended Motion for a New Trial, on account of the court having no jurisdiction."

We do not understand why the court was not possessed of jurisdiction to entertain the amended motion. It was affirmatively shown that it was at the same term of court during which the judgments entered were under control of the court. A similar question was before the court in Bankston's case, 80 Texas Crim. Rep., 629, and practically the same question was decided by this court in Bundick's case, 59 Texas Crim. Rep., 9. In both of the cases mentioned, the conclusion was the opposite of that which seems to control the trial court in disclaiming jurisdiction. In our opinion the amended motion should have been considered if it was deemed necessary. However, as the record is presented, the original motion as stated above, had attached to it the affidavit of a witness, and without objection, both the State and the appellant introduced as witnesses all of the men who sat upon the jury who tried the appellant, and they, under oath, related their version of the transaction. The fact that the verification of the motion by the appellant was omitted by inadvertence was uncontroverted and we perceive no substantial reason why the appellant, upon his request, should have been denied the privilege of verifying his original motion.

From the notations made by the learned trial judge, we infer that the original motion was overruled upon the idea that inasmuch as it was not verified, it presented no issue of fact and that the amended motion was overruled upon the ground that after overruling the original motion the court was without jurisdiction to further entertain the matters raised in the application for a new trial, and because of this we understand the merits of the complaint were not considered. Our review of the evidence heard upon the motion for a new trial leads us to the conclusion that its nature was such, when considered in connection with the verdict rendered, as would not warrant the refusal of a new trial. The statute, Art. 837, C. C. P., declares that "a new trial shall be granted * * * where the jury, after having retired to deliberate upon a case, have received other testimony; * * * or where, from the misconduct of the

jury, the court is of opinion that the defendant has not received a fair and impartial trial.'' Information given by one of the jurors to the others is new and other testimony within the meaning of the statute. See McDougal v. State, 81 Texas Crim. Rep., 181, and cases therein cited. The statement by one of the jurors to others that the accused on trial has been convicted of another offense has often been held new evidence of such material character as to warrant a reversal, though it is not so in every case. See Tutt v. State, 49 Texas Crim. Rep., 202; Clements v. State, 69 Texas Crim. Rep., 369, and other cases listed in McDougal's case, *supra*. An impartial jury is essential to a fair trial, and a juror who is in possession of facts which might prejudice him against the accused on trial and who consciously fails to disclose such knowledge in response to appropriate questions on *voir dire,* and whose first act after he is impaneled as a juror is to communicate to his fellows the prejudicial fact that the accused has been previously tried and convicted of homicide cannot be regarded as an impartial juror within the meaning of the Constitution. See Long v. State, 10 Texas Crim. App., 198; Sewell v. State, 15 Texas Crim. App., 62; Graham v. State, 28 Texas Crim. App., 582; McWilliams v. State, 32 Texas Crim. App., 269; Hughes v. State, 60 S. W. Rep., 562; Hopkins v. State, 68 S. W. Rep., 986; also Weaver v. State, 85 Texas Crim. Rep., 111; Nantz v. State, 94 Texas Crim. Rep., 287; Adams v. State, 92 Texas Crim. Rep., 269.

The jury acts as a unit, and the bias or prejudice of one of its members is sufficient to vitiate the verdict. McWilliams v. State, 32 Texas Crim. Rep., 209; Long v. State, 32 Texas Crim. App., 145; Graham v. State, 28 Texas Crim. Rep., 563; Ruling Case Law, Vol. 16, p. 312, Sec. 120.

The other bills of exception found in the record have been examined. Many of them refer to matters of practice not likely to occur upon another trial. None of the matters embraced in the bills which we have omitted to discuss impress us as revealing error warranting a reversal; nor of a nature justifying the extension of this opinion by their discussion.

Because of the errors pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*