# JUNE 23, 1933

### Doye Arnold v. The State.

No. 15903. Delivered June 23, 1933.
Reported in 62 S. W. (2d) 130.

296

The opinion states the case.

*L. H. Welch* and *Floyd Jones,* both of Breckenridge, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, death.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed Zelma Arnold by striking her with a rock.

Deceased was appellant's wife. Appellant had been away from deceased about two years. During his absence Roy Hightower lived in the same house with deceased. Upon his return, appellant and deceased took up their residence together. According to the version of appellant's witnesses, deceased and appellant lived together as man and wife. The state's testimony tended to show that appellant and deceased merely lived in the same house, and that during such time deceased was contemplating a divorce suit against appellant. In a short time after appellant's return, deceased instituted divorce proceedings. According to the state's testimony, appellant stated to deceased that he would kill her the day the divorce was granted. Again, the testimony of the state was to the effect that appellant had made other threats against the life of deceased. It appears from the testimony that prior to the homicide appellant and Roy Hightower had had a difficulty; and that later Hightower asked a friend to tell appellant that he (Hightower) did not want his wife. According to the testimony of some of appellant's witnesses, deceased had on one occasion stated that appellant was wrong in believing that she was going to live with him; and, in the same connection, declared that she was going away with Roy Hightower.

The homicide occurred on a street in the city of Breckenridge. Appellant and deceased were conversing when the lawyer representing deceased in her divorce proceeding approached. In appellant's presence deceased asked her lawyer if the divorce had been granted; his reply being that everything was all right. Deceased then asked the lawyer to assure her husband that the proceedings were regular. Her lawyer said to appellant: "We got the divorce yesterday legally and regular and binding." Appellant made no reply. Witnesses for the state testified that within ten minutes after this occurrence they heard deceased say to appellant: "I am not going." Immediately after this statement was made, appellant stabbed deceased in the abdomen with a knife, and, seizing a rock weighing six or eight pounds, beat her brains out. Witnesses ran to the rescue of deceased, and appellant desisted. Appellant threw the rock down and said that he could not help it; that he still loved his wife better than anyone; and, further, that he would go to the courthouse and surrender. Appellant went alone to the courthouse and surrendered to the authorities.

A witness for appellant testified that he had a conversation with appellant shortly before the homicide, in which appellant told him that he and deceased were going to look at a house which they intended to rent. Other witnesses for appellant testified that appellant appeared to be nervous and excited on the day of the homicide. Many witnesses for appellant testified that appellant was a man of low mentality, and others testified that, in their opinion, he was insane.

The state took issue with appellant on his plea of insanity and introduced many witnesses, among them being physicians, who testified that in their opinion appellant was sane.

In his motion for new trial, appellant alleged that the jury, after retiring to deliberate upon the case, received other testimony. The specific complaint was that, before the penalty was determined upon, the statement was made by some of the jurors that appellant had been confined in the penitentiary during the two years' separation from his wife; and further that on one occasion, appellant had been convicted and given the death penalty in another case, which later had been set aside and a life sentence assessed, and that eventually he had been pardoned. The testimony complained of had not been received in evidence during the trial. However, on the trial one of the witnesses had volunteered the information that a letter she had seen had been written by appellant from the "pen." Upon objection by appellant's counsel, this statement had been withdrawn from the

consideration of the jury. It appears from the testimony heard on the motion that upon the first ballot it had been unanimously agreed that appellant was sane, and that he was guilty of murder with malice. Without further discussion, a ballot was then taken on the penalty to be assessed. Nine of the jurors voted to assess death. Another voted for 99 years, and two declared that they were not at that time pepared definitely to decide the matter. The jury then went to lunch. Upon their return they gathered about the table and read the court's charge. After discussing the charge, another ballot was taken, the result being eleven for the death penalty and one for 99 years. A general discussion of the case was then had. During this discussion it was asserted by some of the jurors, before reaching a decision as to the penalty to be assessed, that it was in evidence that appellant had been in the penitentiary prior to his return to Brackenridge. Some of the jurors stated that the court had withdrawn this evidence, and it was not proper to consider it. It appears not to have been further discussed. Several of the jurors testified on the hearing that the fact that appellant had received the death penalty in a transaction other than the one involved in the prosecution was referred to and, further, that it was stated that appellant had finally received a life term, but had been pardoned. Several of the jurors stated that they did not hear this matter mentioned. Those who said that it occurred declared that, upon suggestion by one of the jurors that it was improper to discuss the matter, it was not further referred to. Again, several of the jurors testified that the "Ratliff Case" was referred to, and mention made of the fact that Ratliff had been given the death penalty and thereafter brought back to Eastland county (which is near Stephens county) on an insanity hearing, and while there killed the jailer. One of the jurors testified that the "Ratliff Case" was used as an argument in discussing the question as to whether 99 years or the death penalty should be assessed. He said he used the case as an illustration while discussing the question of penalty with the juror who stood for 99 years; and that in about 30 minuets after such discussion this juror agreed to the death penalty. It appears that several of the jurors knew that appellant had been in the penitentiary and that some of them were aware of the fact that, in another case, the death penalty had been assessed against him, and that he had later been sent to the penitentiary, but thereafter pardoned. The juror who stood for 99 years declared that he was aware of all of the matters discussed in the jury room concerning appellant's past record,

and that he also knew about the "Ratliff Case." It appears that the matters to which reference has been made were mentioned in connection with the argument among the jurors that it would be against the welfare of society to assess a penalty of 99 years instead of death, in view of the fact that appellant would likely be pardoned.

We are of the opinion that the learned trial judge fell into error in refusing to grant the motion for new trial. Subdivision 7 of article 753, C. C. P., provides that a new trial shall be granted in cases of felony where the jury, after having retired to deliberate upon a case, have received other testimony. Information given by one of the jurors to the others is new and other testimony within the meaning of the statutes. See McDougal v. State, 81 Texas Crim. Rep., 179; Hanks v. State, 99 Texas Crim. Rep., 218. Where, after retirement, the jury receive other evidence damaging to the appellant, the presumption of injury will obtain. Brown v. State, 101 Texas Crim. Rep., 639; Holland v. State, 298 S. W., 898. Under the circumstances, we are unable to reach the conclusion that the matters constituted a bare reference to former convictions. They evidently furnished a basis for an argument made by some of the jurors in an effort to convince the juror voting for 99 years that it would be proper to assess the death penalty. Notwithstanding some of the jurors already knew the facts relating to appellant's former convictions, it occurs to us that, when such jurors resorted to such facts for the purpose of influencing others, the matter presents error. The references in question might have made the jurors who voted for the death penalty more steadfast in their position, and may have influenced the juror who stood for 99 years to surrender the position he had taken. This being a case in which the extreme punishment has been assessed, we would not feel warranted in speculating as to the injury resulting to appellant from the improper references to his former convictions. We disclaim any intention of predicating a reversal upon the testimony showing reference to the "Ratliff Case."

We think it was improper for the state to prove that some time before the homicide appellant had a conversation with an undertaker, in which he asked him how his business was progressing, and that, upon receiving a reply that it was quiet, stated to the undertaker that he thought he would have some more business in a few days. This statement was too indefinite to be taken as a threat against deceased.

It is shown in bill of exception No. 6 that a witness for appellant was required to testify on cross-examination that deceased

had told him that appellant had made threats against her on several occasions. It appears that these threats were made several years before the homicide. As we understand the bill of exception, it shows that appellant was not present at the time the threats were made. The testimony was hearsay and should not have been received.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.